CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
July 29, 2024
LAURA A. AUSTIN, CLERK
BY: s/ D. AUDIA
    DEPUTY CLERK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| DAVID J. PETERSON, <br>          *Plaintiff*, <br> v. <br> BLACK BODY CORPORATION, *et al.*, <br>          *Defendants*. | CASE NO. 3:23-cv-34 <br><br> MEMORANDUM OPINION <br><br> JUDGE NORMAN K. MOON |

  Plaintiff David Peterson, proceeding pro se, brings an Age Discrimination Act claim against Defendants. While the events described by Plaintiff present an unfortunate end to a long employment relationship, the Defendants are entitled to summary judgment for the reasons explained below.

## BACKGROUND

  Plaintiff began working for Antec, a printing equipment business in Charlottesville, Virginia, in 1990, as a sales employee earning an 11% commission. Dkt. 52 ¶¶ 1, 2. Black Body Corporation ("BBC"), a Missouri company, purchased the stock of Antec in 2018. *Id.* ¶ 4. Plaintiff remained an employee of Antec after this sale, as Antec continued to operate out of its Charlottesville facility. *Id.* ¶ 5.

  Ron Vinyard owns 73% of BBC's outstanding capital stock. *Id.* ¶ 4. In addition, Vinyard was the president of Antec. *Id.* ¶ 7. Eric Stogsdill was Antec's vice president. *Id.*

  Due to COVID-19, Antec placed its employees on furlough on April 1, 2020. *Id.* ¶ 8. The furlough ended September 1, 2020. *Id.* ¶ 9. What happened during and after the furlough period are points of contention between the parties. BBC and Antec assert that Plaintiff refused to return to work, voluntarily ending his employment with Antec. *Id.* ¶ 10. Plaintiff asserts that, to the

1

contrary, he had continued to work through the furlough period and had agreed to delay his "official" return until Antec was ready to resume providing Plaintiff's medical and vacation benefits. Dkt. 60 at 4–5.

Regardless of precisely which position is correct, it is undisputed that in the fall of 2020, the question arose of Plaintiff striking out on his own. Dkt. 52 ¶ 16. The parties differ as to who came up with this idea and as to the nature of the negotiation. Defendants assert that Plaintiff came up with the idea. *Id.* Plaintiff posits that the idea only arose because it became obvious that he was being pushed out, and that he would only accept a distributor role—as opposed to taking the role of an independent contractor in sales. Dkt. 60 at 6; Dkt. 54-2 at 15. (Peterson Deposition Part 2, at 168).

It is undisputed that around December 2020 or January 2021, Antec decided to close the Charlottesville facility and relocate to Missouri. Dkt. 52 ¶ 21. Likewise, there is no dispute over the fact that Stogsdill traveled to Charlottesville to meet with Antec employees on February 1, 2021, to discuss their relocation options. *Id*. Plaintiff stated in his deposition that he remembers nothing about meeting with Stogsdill on or around February 1, 2021. Dkt. 54-4 (Peterson Deposition 1, at 20–21). BBC and Antec offer evidence that during the meeting, Stogsdill conveyed to Peterson that his employment relationship with Antec was going to end. Dkt. 54-4 at 7 (Stogsdill Declaration ¶ 31); Dkt. 52-6 at 1–2 (Franz Declaration ¶¶ 4–8).

It is likewise undisputed that before and during the meeting, Plaintiff and Antec engaged in exchanges about the possibility of Plaintiff moving to a role as an independent contractor with a 15% commission, and that Plaintiff did not want that role, and that it was clear that Antec and Peterson were going to part ways. Dkt. 54-3 ¶¶ 28–29 (Stogsdill declaration); Dkt. 54-2 at 16 (Peterson Deposition 2, at 173–175); Dkt. 60 at 7–8 (Plaintiff's Opposition to Antec and BBC's

Motion for Summary Judgment). Plaintiff was only interested in an independent venture if it was a distributorship, but that was not on the table. *Id.* At some point in the following weeks, Plaintiff attempted to speak with Vinyard, Stogsdill's boss, to "talk some sense into him." Dkt. 60 ¶ 39.

Stogsdill sent (and Plaintiff received) a letter dated March 10, 2021, which stated that Plaintiff's position was being permanently terminated as of that date. Dkt. 60 at 39; Dkt. 60-1 (Exhibit G, Letter); Dkt. 54-2 (Email); Dkt. 52 ¶ 39. Plaintiff called Vinyard the next day, March 11, 2021. Dkt. 52 ¶ 40; Dkt. 60 at 9. Plaintiff's coworker Mark Higgins testified that he overheard part of the conversation, which was in the Antec office on speakerphone. Dkt. 60-12 (Exhibit U). According to Higgins, Vinyard said "Dave, we have a problem with your age" or "Dave, your age is a problem." *Id*. Plaintiff did not, in his own deposition,[1] recall a statement about age during the call. Dkt. 54-2 at 12–13 (Peterson Deposition 2, pp. 137–44).

On March 19, 2021, Peterson sent a letter to Vinyard reiterating his qualifications, that he had worked through furlough, and that business would suffer in his absence. Dkt. 52-7. The letter does not mention age (or any other reason for termination). *Id.* Three weeks after this, Plaintiff flew to Missouri to speak face-to-face with Vinyard without setting up a meeting in advance. Dkt. 54-4 at 12–13 (Peterson Deposition 1, at 172–74). The goal was "to talk some common sense into" Vinyard, but Plaintiff did not succeed. *Id*. He declined to sign a separation agreement. *Id*.

In February 2023, almost two years after all these events, Defendant ASPEQ purchased the assets of BBC and Antec. Dkt. 50 at 2; Dkt. 59 at 2. In April of 2023, Defendant SPX merged with ASPEQ. *Id.* These events are undisputed.

---

[1] In briefing, Plaintiff contends that he "remembers vividly" that Vinyard stated his age was a problem. Dkt. 60 at 9.

LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable [fact finder] could return a verdict for the nonmoving party," and "[a] fact is material if it might affect the outcome of the suit under the governing law." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018).

The moving party bears the burden of establishing that summary judgment is warranted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If the moving party meets this burden, the nonmoving party must set forth specific, admissible facts to demonstrate a genuine issue of fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The non-movant may not rest on allegations in the pleadings; rather, he must present sufficient evidence such that a reasonable fact finder could find by a preponderance of the evidence for the non-movant. *See Celotex Corp.*, 477 U.S. at 322–24; *Sylvia Dev. Corp. v. Calvert Cnty, Md.*, 48 F.3d 810, 818 (4th Cir. 1995). The district court must "view the evidence in the light most favorable to the nonmoving party" and "refrain from weighing the evidence or making credibility determinations." *Variety Stores, Inc.*, 888 F.3d at 659.

DISCUSSION

1. *Plaintiff's ADEA claim is untimely, and consequently Defendants are entitled to summary judgment*

To pursue an Age Discrimination in Employment Act (ADEA) claim, a plaintiff must first "file a charge [with the EEOC] within either 180 or 300 days of the date of the act or lose the ability to recover for it." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002). In Virginia, 300 days is the operative deadline. *Hardy v. Lewis Gale Med. Ctr., LLC*, 377 F. Supp. 3d 596, 612 (W.D. Va. 2019); VA. ADMIN. CODE § 45-20-30 (E). This statute of limitations is not

a technicality that can lightly be set aside. *See Price v. Litton Bus. Sys., Inc.,* 694 F.2d 963, 965–66 (4th Cir. 1982) (stating that equitable estoppel can only provide a basis to toll the statute of limitations only when "the employee's failure to file in timely fashion is the consequence either of a deliberate design by the employer or of actions that the employer should unmistakably have understood would cause the employee to delay filing his charge[,]" and that "an employee's hope for rehire, transfer, promotion, or a continuing employment relationship [] cannot toll the statute absent some employer conduct likely to mislead an employee into sleeping on his rights.") (citations omitted).

When a plaintiff brings an ADEA suit based on termination of employment, the 300-day clock begins to run when that decision is made and communicated, not on the day when the employment relationship ends. *Delaware State Coll. v. Ricks,* 449 U.S. 250, 259 (1980) (holding that the EEOC charge clock began running when a college chose to deny tenure to a professor and communicated its decision, not when the employment contract elapsed). Notably, this includes circumstances when a plaintiff learns of the occurrence's discriminatory nature after the fact. The termination decision itself still starts the clock. *Hamilton v. 1st Source Bank*, 928 F.2d 86, 87–88 (4th Cir. 1990).

Plaintiff filed his EEOC charge based on discriminatory discharge on December 2, 2021. Dkt. 60-6 (EEOC Charge). February 5, 2021, is 300 days before this date. Consequently, Plaintiff's charge is untimely if the discriminatory occurrence which Plaintiff complains of happened before February 5, 2021.

It's undisputed that the decision to sever Plaintiff from Antec was already made and had been communicated to him by February 1, 2021. Dkt. 54-4 at 7 (Stogsdill Declaration ¶ 31, "I once again told Peterson during this meeting on February 1, 2021 that as Peterson was not an

5

employee and his position had been eliminated, Antec's relationship with Peterson had come to an end, that Antec would be severing its association and affiliation with Peterson, and it was time to part ways."); *see also* Dkt. 52-6 at 1–2 (Franz Declaration ¶¶ 4–8).

Plaintiff asserts that he was discharged on March 9, 2021. Dkt. 60 at 6. However, he points to nothing that creates a factual dispute as to whether Antec's decision to end his employment had been made, and communicated to him, by February 1, 2021, at the latest. That date is more than 300 days before he filed his EEOC charge, making it untimely.

Consequently, Plaintiff's ADEA claim cannot proceed and all Defendants are entitled to summary judgment. This grounds alone disposes of the case; however, as the Court explains below, there is another independent grounds for dismissal.

2. *The ADEA applies to employers who have at least twenty employees; the record does not show that Antec falls within this category, or that Antec and BBC should be treated as an integrated employer*

The ADEA governs employers who have twenty or more employees. 29 U.S.C. § 630(b).

First, as to Antec, the business which employed Plaintiff: it is undisputed that Antec had, at most, six employees. Dkt. 60-13 (Exhibit V). It is not clear at what point those six people worked for Antec. Regardless, Antec, standing alone, does not come within the ambit of the ADEA. Nor does the record show that BBC, Antec's parent company, was Plaintiff's employer.

Generally, "when a subsidiary hires employees, there is a strong presumption that the subsidiary, not the parent company, is the employer." *Johnson v. Flowers Indus., Inc.*, 814 F.2d 978, 980 (4th Cir. 1987). This presumption applies except in "extraordinary circumstances," such as where the parent company 1) exercises control over the subsidiary by hiring and firing the subsidiary's employees and supervises daily operations, or 2) has integrated with the subsidiary, such as by commingling funds and sharing the same facilities and workforce. *Id.* at 981.

BBC and Antec offer evidence that the businesses maintained separate operations. This includes Plaintiff's deposition testimony that the same employees carried on at Antec after its acquisition by BBC. Dkt. 54-2 at 9 (Peterson Deposition 2, at 128). Their employment continued on the same terms. Dkt. 54-3 ¶ 38 (Stogsdill Declaration). Antec employees did their work without substantial external oversight or direction. Dkt. 54-1 at 7 (Higgins Deposition at 271–72, stating that he and Plaintiff had the knowledge and experience to run the Charlottesville office, and "pretty much" did so.") Plaintiff had considerable autonomy. For instance, he stated that he had freedom to select customers; that there was no mandated sales script or process; and that he could offer discounts at his discretion. Dkt. 52-2 at 7–8 (Peterson Deposition 2, at 113–16). In addition, Plaintiff could essentially do as he liked in terms of using the Antec office for other purposes: he did not have to obtain permission from anyone to stay overnight in the office for a week, or to store a "kitchen's worth of cabinets" in the Antec office when he was assisting his daughter with building a house. Dkt. 54-4 at 7 (Peterson Deposition 1, at 33–35).

The sworn statements from Stogsdill and Vinyard state that Antec was a separate business entity from BBC, with its own accounting system, bank account, checking account, assets, liabilities, credit card accounts, financial and business records, and separate payroll. Dkt. 52-3 ¶ 5 (Vinyard Declaration); Dkt. 54-3 ¶ 3 (Stogsdill Declaration). Antec had a separate tax identification number and filed its own separate taxes; and until June 2021, when Antec relocated to Missouri, Antec maintained records at its Charlottesville facilities. *Id.*; Dkt. 54-3 ¶¶ 3, 4 (Stogsdill Declaration).

Plaintiff provides evidence that a BBC employee dealt with administering his compensation and benefits (Dkt. 60, Ex. R: Emails to and from Nany Stout, BBC Controller) as well as Antec payroll generally. (Ex. T). This evidence does not show that BBC was exercising

control over Antec's hiring decisions or day-to-day work. Rather, Plaintiff attested to his own autonomy, as noted above. Nor does Plaintiff's evidence show that BBC and Antec—which had separate employees, offices, assets, and business records—had become an enmeshed, integrated employer.

Because the record shows that Antec is outside the scope of the ADEA, and there is no genuine issue of fact as to whether BBC was also Plaintiff's employer, the Defendants are entitled to summary judgment.[2]

CONCLUSION

For these reasons, the Court will grant Defendants' Motions for Summary Judgment, Dkts. 49, 51. An Order will issue to this effect.

The Clerk of Court is directed to send this Memorandum Opinion to Plaintiff and all counsel of record.

Entered this 29th day of July, 2024.

*[signature]*
NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE

---

[2] This includes Defendant ASPEQ, which purchased the assets of BBC in 2023, and SPX, which ASPEQ merged with later that year. Plaintiff has not shown that BBC was his "employer" for ADEA purposes; consequently, this determination applies equally to the entities which acquired BBC.